IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

DENNIS F. WILSON,

       Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

No. C08-2037

REPORT AND RECOMMENDATION

———————————

## TABLE OF CONTENTS

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . 2

III.  PRINCIPLES OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . 3

IV.  FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    A.   Wilson's Education and Employment Background. . . . . . . . . . . 4
    B.   Administrative Hearing Testimony. . . . . . . . . . . . . . . . . 5
        1.   Wilson's Testimony. . . . . . . . . . . . . . . . . . . . . . 5
        2.   Dr. Hickman's Testimony. . . . . . . . . . . . . . . . . . . 6
        3.   Vocational Expert's Testimony. . . . . . . . . . . . . . . . 7
    C.   Supplemental Hearing. . . . . . . . . . . . . . . . . . . . . . . 9
        1.   Dr. Hickman's Testimony. . . . . . . . . . . . . . . . . . . 9
        2.   Vocational Expert's Testimony. . . . . . . . . . . . . . . . 10
    D.   Wilson's Medical History. . . . . . . . . . . . . . . . . . . . . 11

V. CONCLUSIONS OF LAW. . . . . . . . . . . . . . . . . . . . . . . . 17
    A.   ALJ's Disability Determination. . . . . . . . . . . . . . . . . . 17
    B.   Objections Raised by Claimant. . . . . . . . . . . . . . . . . . 19
        1.   Credibility Determination. . . . . . . . . . . . . . . . . . 19
        2.   Dr. Samo's Opinions and the ALJ's Development of the
            Record. . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
            a.   Did the ALJ Fully and Fairly Develop the Record?. . . . 25

        *b.*      *Did the ALJ Properly Consider Dr. Samo's*

                 *Opinions?*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

       *3.*     *Hypothetical Question.* . . . . . . . . . . . . . . . . . . . . . . . . .  31

*VI.*    *CONCLUSION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

*VII.*   *RECOMMENDATION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 1) filed by Plaintiff Dennis F. Wilson on May 28, 2008, requesting judicial review of the Social Security Commissioner's decision to deny his applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Wilson asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide him disability insurance benefits and SSI benefits. In the alternative, Wilson requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On March 4, 2005, Wilson applied for both disability insurance benefits and SSI benefits. In his applications, Wilson alleged an inability to work since December 31, 2003 due to neck pain and bipolar disorder. Wilson's applications were denied on June 10, 2005. On August 16, 2005, Wilson's applications were denied on reconsideration. On September 8, 2005, Wilson requested an administrative hearing before an Administrative Law Judge ("ALJ"). On July 13, 2007, Wilson appeared with counsel before ALJ Denzel R. Busick for an administrative hearing. Wilson, vocational expert Vanessa May, and medical expert Dr. John Hickman, Ph.D., testified at the hearing. On November 16, 2007, Wilson appeared with counsel before ALJ Busick for a supplemental hearing. Dr. Hickman and vocational expert G. Brian Paprocki testified at the supplemental hearing. In a decision dated December 6, 2007 the ALJ denied Wilson's claims. The ALJ determined that Wilson was not disabled and not entitled to disability insurance benefits

2

or SSI benefits because he was functionally capable of performing other work that exists in significant numbers in the national economy. Wilson appealed the ALJ's decision. On May 2, 2008, the Appeals Council denied Wilson's request for review. Consequently, the ALJ's December 6, 2007 decision was adopted as the Commissioner's final decision.

On May 28, 2008, Wilson filed this action for judicial review. The Commissioner filed an Answer on July 31, 2008. On October 2, 2008, Wilson filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that he is not disabled and that he could perform other work that exists in significant numbers in the national economy. On December 31, 2008, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On January 12, 2009, Wilson filed a reply brief. On April 7, 2009, Chief Judge Linda R. Reade referred this matter to a Magistrate Judge for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the ALJ's decision 'if the ALJ's findings are supported by substantial evidence on the record as a whole[.]'" *Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007)). Evidence is

3

"substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009) (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004)). Furthermore, "[s]ubstantial evidence is 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (quoting *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989), in turn quoting *Consolo v. Fed. Mar. Comm'n*, 282 U.S. 607, 620 (1966)).

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Wagner*, 499 F.3d at 484 (citing *Bowman v. Barnhart*, 310 F.3d 1080, 1083 (8th Cir. 2002)). "[E]ven if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)).

## IV. FACTS

### A. Wilson's Education and Employment Background

Wilson was born in 1962. He completed the tenth grade and later earned his GED. At the hearing, Wilson testified that he had some special education classes at school because he was "slower" in his studies. He also testified that he was able to read and write and perform basic mathematics.

The record contains a detailed earnings report for Wilson. The report covers Wilson's employment history from 1990 to 2006. During that time period, Wilson worked primarily as a Certified Nurse's Assistant and Certified Medical Assistant. From 1990 to

4

2004, Wilson earned between \$5,996.50 (2004) and \$25,991.19 (2001). He earned \$1,145.43 in 2005 and had no earnings in 2006.

## B. Administrative Hearing Testimony

### 1. Wilson's Testimony

At the administrative hearing, Wilson's attorney questioned Wilson about his physical disabilities. In discussing his physical disabilities, Wilson stated "[f]irst off I got a plate in my neck due to an injury I got in 2002, and then, then I have, I take medication for rapid heartbeat."[1] Wilson testified that his neck injury limits his ability "to do things." Specifically, Wilson stated that he has difficulty moving his neck at times due to swelling and he gets "real bad" headaches. According to Wilson, he can sit for "probably" 15 to 20 minutes before needing to get up and move around or lay down. Standing and walking, however, do not bother him. He indicated that repetitive heavy lifting causes neck pain and swelling. Specifically, Wilson asserted that he could lift 50 pounds one time and 10 to 15 pounds multiple times. When asked whether he had difficulty with bending, stooping, twisting, squatting, kneeling, or crawling, Wilson replied "[n]ot that I know of."[2] Lastly, Wilson testified that he had difficulty with reaching out to the side or to the front.

Next, Wilson's attorney questioned Wilson about his mental disabilities. Wilson testified that he suffered from problems with depression, bipolar disorder, and anxiety. In discussing his mental disabilities, Wilson explained that:

> A: Sometimes I have, you know, my moods can be swinging up and down. I do go through some depression.
> Q: Is it mostly depression?
> A: Yes.
> Q: Do you have any periods where you're manic, where you're very high?

---

[1] See Administrative Record at 414.

[2] See Administrative Record at 417.

5

| A: | Usually the Depakote that I take usually helps with that and it helps stabilize my mood, so you know there's days that I can deal okay and then there's days that I don't do so well. I mean it just -- |
| --- | --- |
| Q: | How many days would there be in a month that you wouldn't do so well? |
| A: | Oh, I'm thinking in a month probably 10 to 12 days. |
| Q: | And on those days what do you do? |
| A: | A lot of times I just isolate myself and stay in my room and sleep. |
| Q: | Okay. Does the bipolar or anxiety affect your ability to remember things? |
| A: | If I'm having problems with, with it, yes. But for the most part I'm okay with my memory. |
| Q: | So when you're in depressed states, which is a third of the time, you have trouble remembering things, is that right? |
| A: | Yeah, sometimes because my mind goes racing and then I'm -- |
| Q: | What kind of, what kind of things do you have problems remembering, day to day things or things that happened a long time ago? |
| A: | Well some -- sometimes it can be simple things, you know, and it just takes me a while to think about it and I have to slow down and, you know, so -- |

(Administrative Record at 421-22.) Wilson also testified that he: (1) sometimes became irritable and would withdraw from other people, (2) had panic attacks, and (3) had difficulty with concentration about one-third of the time.

### 2. *Dr. Hickman's Testimony*

At the hearing, Dr. Hickman opined that Wilson suffered from a psychological condition based on his diagnosis and intermittent treatment for bipolar disorder. Dr. Hickman also opined that Wilson did not have any marked difficulties with: (1) activities of daily living, (2) social functioning, or (3) concentration, persistence, and pace. The ALJ further questioned Dr. Hickman regarding Wilson's activities of daily living, social functioning, and concentration, persistence, and pace:

| Q: | Okay. Now if we look at those segments, let's talk about activities of daily living and put it on a scale of -- let's just talk about mild up through marked, mild, moderate and marked. If you were looking at the scale where would you put his activities of daily living, to the best you can determine at this point? |
| --- | --- |
| A: | Mild. |
| Q: | Okay. And social functioning? |

. . .

| A: | Well social functioning sounds like, from what he is saying, from his reports, the records, they're between mild and moderate. |
| --- | --- |
| Q: | So that would be variable? |
| A: | Yes. |
| Q: | All right. And then concentration, persistence and pace? |
| A: | That probably varies from mild to moderate. |
| Q: | Okay. Would it vary depending upon the pressure that he's experiencing if he's experiencing time pressures, if he's, has a supervisor pushing him, would he be more in the moderate than in the mild? |
| A: | Yes. |
| Q: | Is this a person who might work best then -- and I'm just asking your opinion as a psychologist -- in more of an isolated type situation? |
| A: | Yes. |

(Administrative Record at 431-32.)

### 3.   *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Vanessa May with a hypothetical for an individual who:

> may be able to work at a light level of work, assume that they should be able to pick up 20 pounds occasionally, 10 pounds frequently; we're going to assume that they can sit up to six hours out of an eight hour workday; and stand and walk combined a total of six with normal work breaks. We're going to find that the person has normal reach, but they have limited

handling or fingering on the left, and we're going to call that occasional. The person should be able to climb stairs frequently. They'd be advised however not to climb ladders, scaffolds or ropes. They can balance frequently, crouch frequently, kneel frequently, stoop and crawl -- stoop frequently, but crawl only occasionally. No visual limits, no communication limits, but they should avoid concentrated exposure to hazards, such as unprotected heights or fast or dangerous vibrations. They're afflicted with pain from a variety of sources that would produce mild to moderate chronic pain and discomfort, noticeable to the person at all times. With appropriate medications, however, they should be able to remain active at sedentary up through most light levels of activity, but they would nonetheless, at all times, have mild limits on their activities of daily living. They would have mild to moderate limits on their social functioning; mild to moderate limits on their concentration, persistence and pace. Although it's not otherwise quantified, one could infer that as the day proceeds -- in other words, as an eight[-hour] work period proceeds, those limitations would increase from a mild restriction to a moderate restriction, such that for the first four to five hours of a[n] eight hour work period the person would be mostly in a mild range of limitation, and then the last three to four hours of a work day they would be more in a moderate range of restriction. That would translate into similar restrictions in those types of ratios, in the ability to understand, remember or carry out details, maintain extended concentration, to be punctual or other wise [sic] perform within customary tolerance, to accept instruction or criticism from supervisors, to respond to changes in their work setting or work routine, interact appropriately with the general public, and otherwise complete a normal workday or work week without some interruption from psychologically based problems. It is likely that those restrictions would tend to all prevail at the same time throughout an eight hour work period, but would be variable from mild to moderate as I've described.

(Administrative Record at 437-39.) The vocational expert testified that under such limitations, Wilson could not perform his past relevant work. The vocational expert further testified, however, that Wilson could perform the following work: (1) blind aide

8

(4,700 positions in Iowa and 532,000 positions in the nation), (2) gate guard (6,200 positions in Iowa and 970,000 in the nation), (3) photocopy machine operator (800 positions in Iowa and 97,000 positions in the nation), and (4) order caller (35,000 positions in Iowa and 2,900,000 positions in the nation).

## C. *Supplemental Hearing*

### 1. *Dr. Hickman's Testimony*

At the supplemental hearing, Dr. Hickman reported that Wilson had diagnoses of bipolar disorder, anxiety disorder when he was younger, and a history of alcohol and substance abuse in remission. Dr. Hickman indicated that Wilson did not have any marked limitations with activities of daily living or social functioning.[3] Dr. Hickman, however, opined that at times, Wilson's concentration, persistence, and pace might be "markedly disrupted" due to his bipolar disorder. The ALJ asked Dr. Hickman how often Wilson would reach a marked level of limitation in concentration, persistence, and pace. Dr. Hickman responded:

> A: Well that's considered a (inaudible) function disorder where if [Wilson], he's in a situation that requires too much multi-tasking, or too many social interactions, he may get kind of bogged down temporarily if he's (inaudible) to function very well.
>
> Q: Okay. So would I be correct if I were to assume, for example, if he were in a work environment and he were to have certain time constraints placed on him, in other words quotas or a supervisor who is pushing him to get more done, would there be a possibility he might reach a marked level of, of limitation?

---

[3] The supplemental hearing transcript is incomplete on the issues of activities of daily living and social functioning because the transcript provides that portions of Dr. Hickman's testimony on these issues were inaudible. However, it appears both from the transcript itself, and from Wilson's Brief that Dr. Hickman's opinions suggested no marked limitations in these areas. *See* Administrative Record at 453-54; *see also* Wilson's Brief at 12.

A:     Well I'm thinking more about a higher level job might
       be problematic. I don't think typical routine activities
       would be problematic. I think that the --

Q:     And so if he worked at the skilled or semi-skilled type
       positions --

A:     Yeah, if he was a dispatcher for, you know, a lot of
       calls and decisions to make, or a stockbroker or
       something, he might feel (inaudible) to carry the load.

(Administrative Record at 454-55.)

### 2.    *Vocational Expert's Testimony*

At the supplemental hearing, the ALJ provided vocational expert G. Brian Paprocki
with a hypothetical for an individual who:

> can work at a light level of work, such that they could pick up
> 20 pounds occasionally, 10 pounds frequently. We'll assume
> initially can sit six hours, stand or walk six hours, with normal
> breaks. I'm going to assume the person has limited handling
> on the left hand. They can climb stairs frequently, but they
> probably shouldn't climb ladders, scaffolds or ropes.
> Otherwise, no major postural limitations, no visual,
> communication, but they should avoid concentrated exposure
> too hazards such as unprotected heights, fast or dangerous
> machinery, high vibrations. They would, most of the time,
> have mild limits on activities of daily living; likely have
> moderate limits on social functioning; moderate limits on
> concentration, persistence and pace; would likely be
> moderately limited in the ability to understand, remember,
> carry out details, maintain extended concentration, perform
> work within customary tolerances; interact properly with the
> general public; accept instruction or criticism from
> supervisors; maintain socially appropriate behavior; respond
> to changes in work setting or work routine. When I use the
> term moderate we're going to use it, at least at this point, in
> the sense that it means those abilities are noticeably affected,
> but not necessarily precluded.

(Administrative Record at 466-67.) The vocational expert testified that under such
limitations, Wilson could not perform his past relevant work. The vocational expert

further testified, however, that Wilson could perform the following work: (1) surveillance system monitor (350 positions in Iowa and 35,000 positions in the nation) and (2) sedentary administrative support worker such as a document preparer or addresser (800 positions in Iowa and 250,000 positions in the nation).

### D. Wilson's Medical History

On March 29, 2002, Wilson met with Dr. Cassim Igram, M.D., for consultation regarding neck pain and left arm pain. Upon examination, Dr. Igram found probable C7 radiculopathy. Dr. Igram ordered an MRI for Wilson's neck. On April 12, 2002, Dr. Igram reviewed the results of Wilson's MRI. The MRI showed a herniated disc at C6-7. Dr. Igram treated Wilson with a nerve root block injection. On April 24, 2002, Wilson had a follow-up visit with Dr. Igram. Wilson informed Dr. Igram that his left arm pain persisted and he stated that he "would like something done about this if possible."[4] Dr. Igram recommended a "left sided approach to the neck with C6-7 anterior cervical diskectomy followed by fusion utilizing iliac crest bone graft and plating from C6-7."[5] On May 29, 2002, Wilson underwent the surgery suggested by Dr. Igram. Wilson had a follow-up appointment on June 7, 2002, and Dr. Igram noted that Wilson's left arm was "significantly improved." On July 3, 2002, at another follow-up appointment, Dr. Igram noted that Wilson's left arm was pain free. On September 12, 2002, Dr. Igram found that Wilson was doing "quite well" and reported no pain in his left arm.

On July 8, 2003, Wilson met with Dr. Robert A. Straight, Ph.D., for a mental status examination. Dr. Straight diagnosed Wilson with bipolar disorder and history of polysubstance abuse. Dr. Straight concluded that Wilson's:

> [a]ttention and concentration were within normal limits as he was able to complete the Mental Status Exam without difficulty. This would suggest an adequate ability to acquire

---

[4] *See* Administrative Record at 256.

[5] *Id.* at 255.

> job skills or procedures. Work pace might be impacted by
> complaints of pain, not by mood. Socially, he relates well,
> however, noted some mood swings since he has been off
> medication the last few weeks. Unmedicated this could
> become problematic. Judgment is considered within normal
> limits, as would be his ability to respond to changes in a work
> environment. Both of these would be influenced by his
> Bipolar illness if it were to assert itself in a stronger fashion.

(Administrative Record at 260.)

On July 10, 2003, Dr. Gary Greenberg, M.D., conducted a physical examination on Wilson for Disability Determination Services ("DDS"). Dr. Greenberg noted that Wilson underwent a cervical disk fusion with a bone graft at C6-7 with a "reasonably good" result. Dr. Greenberg further noted that:

> The pain and numbness radiating down his left arm seems to
> have resolved with the surgery, however, he now has
> recurring postoccipital headaches and loss of strength and loss
> of stamina relating to doing repetitive functions in the left arm.
> He denies any pain in his back or lower extremities.

(Administrative Record at 261.) After examination, Dr. Greenberg concluded that Wilson: (1) could frequently lift and carry ten pounds "without too much trouble"; (2) could stoop, climb, kneel, or crawl without "obvious difficulty"; (3) had gross and fine motor movements of the hands intact; and (4) had good vision, hearing, and speaking.

On September 11, 2003, Dr. Dee E. Wright reviewed Wilson's medical records and provided DDS with a Psychiatric Review Technique assessment for Wilson. Dr. Wright diagnosed Wilson with bipolar syndrome. Dr. Wright determined that Wilson had the following limitations: mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Dr. Wright concluded that:

> [Wilson's] allegation of bipolar disorder is supported by the
> evidence in file. However, that diagnosis does not indicate it
> creates significant limitations of function for [Wilson] at this

time. The evidence in file is consistent and does not reflect [Wilson's] limitations of function as described.

(Administrative Record at 291.)

On September 25, 2003, Dr. J.D. Wilson, M.D., reviewed Wilson's medical records and provided DDS with a physical residual functional capacity ("RFC") assessment. Dr. Wilson determined that Wilson could: (1) occasionally lift and/or carry 20 pounds, (2) frequently carry and/or lift 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Wilson also determined that Wilson had no postural, visual, communicative, or environmental limitations. Dr. Wilson found, however, that Wilson had limitations in gross manipulations with his left hand. Dr. Wilson concluded that "[b]ased on the evidence, [Wilson's] capacity to sustain work activity is restricted as indicated on the RFC."[6]

On February 24, 2005, Wilson met with Dr. Paul D. Anderson, D.O., for a psychiatric evaluation. Dr. Anderson noted that:

> Currently [Wilson] has not been sleeping well. He has been feeling hopeless and helpless, without energy. He has suicidal ideation without any firm plan. He has been hiding in his own home, with the shades drawn when possible.

(Administrative Record at 364.) Upon examination, Dr. Anderson found that Wilson: (1) knew the current and past presidents; (2) remembered three out of five objects after five minutes; (3) compared opposites and similarities well; (4) interpreted proverbs fairly abstractly; (5) named all six states that surround Iowa; and (6) had an adequate fund of knowledge regarding events from the Civil War. Dr. Anderson also found that Wilson could not do serial sevens and made errors on serial fours. Dr. Anderson concluded that Wilson was an individual "with a history of bipolar disease, who has not had much

---

[6] *See* Administrative Record at 293.

treatment for over six months and is now depressed."[7] Dr. Anderson diagnosed Wilson with bipolar mood disorder, depression, and a history of substance abuse. Dr. Anderson assigned a GAF score of 35.[8] Dr. Anderson prescribed Paxil and Depakote as treatment.

On April 12, 2005, Dr. David Christiansen, Ph.D., reviewed Wilson's medical records and provided DDS with a Psychiatric Review Technique assessment and mental RFC assessment for Wilson. On the Psychiatric Review Technique assessment, Dr. Christiansen diagnosed Wilson with bipolar syndrome and alcohol dependence in remission. Dr. Christiansen determined that Wilson had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Christiansen determined that Wilson was moderately limited in his ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior and adhere to basic standards of neatness and

_____

[7] *See* Administrative Record at 366.

[8] Global Assessment of Function (GAF) is a "numeric scale (0 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living." *See* Global Assessment of Functioning at http://en.wikipedia.org/wiki/Global_Assessment_of_Functioning

A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.*

cleanliness, and respond appropriately to changes in the work setting. In conclusion, Dr. Christiansen noted that:

> [Wilson] and his wife have contributed ADLs that are consistent with each other. [Wilson] has no valid driver's license, but he does help around the house, pays bills, uses the computer, and watches TV. . . . He reports essentially normal everyday activities, but says that sometimes he does not like being around other people and isolates himself. He says his depression has increased.
>
> The medical record contains treatment notes from the Plains Area Mental Health Center, where [Wilson] saw two psychiatrists, succeeding each other, between 12-03-2003 and 10-13-2004. The diagnosis was Bipolar I Disorder and Alcohol Dependence in Remission. The assigned GAF score was between 60 and 65 during this period. The record reveals a history of bipolar disorder from age 28 forward, with some non-compliance with treatment and at least two brief hospitalizations. On 08-19-2004, the mental status was essentially within normal limits; no symptoms of mania were noted.
>
> [Wilson] began seeing Paul Anderson, D.O.[,] Psychiatrist on 02-24-2005. On mental status exam on that date, he was reported to be disheveled and tearful, but was oriented, with broad affect. His cognitive ability was intact except for a less than good ability maintain concentration as demonstrated by his inability to do serial sevens. No symptoms of mania were described. . . . Dr. Anderson notes that people with this diagnosis often have trouble with attention, concentration, pace, and carrying out instructions. . . .
>
> [Wilson] will have moderate limitations in his ability to maintain social relationships at work and maintain attention, concentration and mental pace. He retains the ability to do simple unskilled work as he has done in the past.
>
> The GAF score of 35, assigned by Dr. Anderson, is inconsistent with the rest of the material in file. Dr. Anderson's treating source opinion is not supported by a full description of the disorder he diagnoses and clearly he has not carefully considered the functioning of [Wilson] as an

15

> individual. The GAF scores from the two other treating
> psychiatrists appear to be appropriate. [Wilson's] credibility
> is mildly reduced by reported non-compliance with treatment.

(Administrative Record at 337.)

On June 6, 2005, Wilson met with Dr. Dave Archer, M.D., for a Social Security

Disability Evaluation. Upon examination, Dr. Archer found that Wilson's disability

centered around his bipolar disorder. Dr. Archer further found that Wilson did not have

a significant disabling neck or blood pressure problem. Dr. Archer concluded that:

> On functional capacity questioning, Mr. Wilson would have
> very little physical disability except as related to his obesity
> and general deconditioning. He would certainly be able to
> resume his job as a nursing assistant if his psychiatric
> problems could be contained.

(Administrative Record at 354.)

On August 7, 2007, at the request of Wilson's attorney, Dr. Paul Samo, M.D.,

filled out Mental Impairment Interrogatories for Wilson. Dr. Samo provided that he had

his first visit with Wilson on March 29, 2006, and continued to see Wilson every two to

three months. Dr. Samo diagnosed Wilson with bipolar disorder. According to Dr. Samo,

the signs and symptoms of Wilson's bipolar disorder are: appetite disturbance with weight

change, sleep disturbance, mood disturbance, anhedonia, and decreased energy. Dr. Samo

indicated that Wilson's prognosis was "fair." Dr. Samo opined that Wilson's impairments

would cause him to be absent from work more than three times per month. Dr. Samo also

opined that Wilson would have the following functional limitations: (1) slight limitations

in his restriction on activities of daily living; (2) moderate difficulties in maintaining social

functioning; and (3) he would often have deficiencies of concentration, persistence or pace

resulting in failure to complete tasks in a timely manner. Dr. Samo further determined

that Wilson would have repeated (three or more) episodes of deterioration or

decompensation in work or work-like settings which would cause him to withdraw or

experience exacerbation of his signs and symptoms. Additionally, in a letter responding to a question from Wilson's attorney,[9] dated August 14, 2007, Dr. Samo opined that:

> I feel that Mr. Wilson would not be able to consistently work eight hour days. It would result in working at a much lower capacity up to a third or quarter of the day.

(Administrative Record at 374.)

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Wilson is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(f); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *see also* 20 C.F.R. § 404.1520(a)-(f). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be

---

[9] Wilson's attorney sent Dr. Samo a letter asking Dr. Samo to respond to the following statement/question:

> Because of deficiencies of concentration, persistence or pace whether it would result in Dennis Wilson being not able to work at a consistent level through an eight-hour day and whether it would result in his working at a much lower capacity up to a third or quarter of each day?

*See* Administrative Record at 374.

not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In order to establish a disability claim, "the claimant bears the initial burden to show that [he or] she is unable to perform [his or] her past relevant work." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id*. The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. "It is 'the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Page*, 484 F.3d at 1043 (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Wilson had not engaged in substantial gainful activity since December 31, 2003. At the second step, the ALJ concluded from the medical evidence that Wilson had the following severe combination of impairments: bipolar disorder, a history of alcohol and cannabis abuse, in remission, and cervical fusion status-post C6-7 herniation. At the third step, the ALJ found that Wilson did not have an impairment or combination of impairments listed in "20 C.F.R. [§] 404, [Appendix 1, Subpart P, Regulations No. 4 (the Listing of Impairments)]." At the fourth step, the ALJ determined Wilson's RFC as follows:

> [Wilson] has the residual functional capacity to work at [a] light level such that he could pick-up 20 [pounds] occasionally and 10 [pounds] frequently; sit 6 hours in an 8-hour day, stand and/or walk 6 h[ou]rs in an 8-hour workday with normal breaks. [Wilson] would have limited handling abilities with the left hand such that he would be able to grip and grasp

occasionally. He could climb stairs frequently but probably should not climb ladders, scaffolds or ropes. He would be able to crawl occasionally. No communication limitations. He should avoid concentrated environmental exposures to hazards, unprotected heights, fast dangerous machines and vibrations. Most of [the] time, he would have mild limits of activities of daily living, moderate limitations with social functioning, moderate limitations with concentration, persistence and pace. In addition, [Wilson] would have moderate limitations in the ability: to understand, remember, and carry out detailed instructions, to maintain extended concentration, to perform within customary tolerances, to interact with the general public, to accept criticism from supervisors, to exhibit appropriate behavior, and to respond appropriately to changes in the routine work setting. In qualifying the term moderate limitations, it would mean that the activities would be noticeably affected but not necessarily precluded. All could be done but with some difficulty.

(Administrative Record at 23.) At the fourth step, the ALJ determined that Wilson was unable to perform any of his past relevant work. At the fifth step, the ALJ determined that based on his age, education, previous work experience, and RFC, Wilson could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Wilson was not disabled.

### B. Objections Raised by Claimant

Wilson argues that the ALJ erred in four respects. First, Wilson argues that the ALJ failed to properly evaluate his subjective allegations of disability. Second, Wilson argues that the ALJ failed to properly evaluate the opinions of Dr. Samo regarding his bipolar disorder. Third, Wilson argues that the ALJ failed to fully and fairly develop the record. Fourth, Wilson argues that the ALJ erred by posing a hypothetical question to the vocational expert which was incomplete and not supported by substantial evidence.

### 1. Credibility Determination

When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support

19

them." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). However, the absence of objective medical evidence to support a claimant's subjective complaints is a relevant factor for an ALJ to consider. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citation omitted). "The [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski*, 739 F.2d at 1322. Subjective complaints may be discounted if inconsistencies exist in the evidence as a whole. *Pelkey*, 433 F.3d at 578 (citing *Polaski*, 739 F.2d at 1322). However, the ALJ must give reasons for discrediting the claimant. *Id.* (citing *Strongson*, 361 F.3d at 1072). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Guilliams*, 393 F.3d at 801 (explaining that deference to an ALJ's credibility determination is warranted if the determination is supported by good reasons and substantial evidence). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Wagner*, 499 F.3d at 851 (quoting *Pearsall*, 274 F.3d at 1218).

In his decision the ALJ determined that:

> After considering the evidence of record, the undersigned finds that [Wilson's] medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that [Wilson's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.
>
> At one point or another in the record, either in forms completed in connection with the application, the range of

daily activities which [Wilson] endorsed from 2003 to 2005 included caring and playing with an infant/toddler, daily mile-long walks, jogging, swimming, reading, regularly mowing the lawn, raking leaves, shoveling snow, taking out the trash, housecleaning, vacuuming, dusting, laundry, playing board games, watching T.V., working on the computer, fishing frequently and cooking meals. . . .

In 2005, [Wilson] endorsed difficulty with mental functioning such as completing tasks, concentration, attention, understanding, following directions and getting along with others. However, activities of daily living remained unchanged and third party reports remained largely unchanged.

The undersigned finds it reasonable to conclude that [Wilson] would experience variable levels of concentration [and] attention as well as difficulty with social interaction dependent on a longstanding diagnosis of bipolar disorder and a history of chronic pain complaints; however, the record clearly documented significant improvement status-post surgical intervention. There were no permanent restrictions assigned, minimal treatment and ongoing conservative management of pain complaints. In addition, the record identified that [Wilson] responded very well to medical management of his bipolar symptoms. However, during periods of non-compliance he experienced deterioration in his mood without significant loss of mental functioning which would preclude the ability to perform work-like activities. For the aforementioned reasons, the undersigned finds [Wilson] less than credible.

(Administrative Record at 25.)

Wilson offers several conclusory arguments in support of his position that the ALJ failed to properly evaluate his subjective allegations of disability. First, Wilson argues that the ALJ's observation that he has "periods" of "fairly normal" activities of daily living should not "form the basis to determine that [Wilson] could engage in competitive

employment."[10] Wilson provides no further discussion or explanation of this argument. In any event, the Court is unpersuaded by this argument because consideration of a claimant's activities of daily living is a proper and appropriate factor for an ALJ to consider when making a credibility determination. *See Polaski*, 739 F.2d at 1322.

Next, Wilson argues that the ALJ does not properly understand bipolar disease because the disease is characterized by "dramatic mood swings from overly 'high' and[/]or [irritable to] sad and hopeless, and then back again, often with periods of normal mood in between."[11] Wilson concludes that:

> The records set forth above mirror that standard course of this disorder. Periods of 'high' symptoms and periods of 'sad and hopeless periods' with 'periods of normal mood' in between. For the ALJ to look at the periods of 'normal mood in between' and find that those times represent [Wilson's] ability to do work related activity or normal activities of daily living is a failure to understand the disease.

(Wilson's Brief at 24.) Having reviewed the ALJ's decision, the Court is unpersuaded that the ALJ failed to understand bipolar disorder. Nowhere in his decision, does the ALJ suggest that he only considered Wilson's "periods of normal mood" in determining that he was capable of performing work-related activities or normal activities of daily living. Instead, the ALJ notes that:

> [Wilson] responded very well to medical management of his bipolar symptoms. However, during periods of non-compliance he experienced deterioration in his mood without significant loss of mental functioning which would preclude the ability to perform work-like activities.

---

[10] *See* Wilson's Brief at 23.

[11] *See* Wilson's Brief at 24. Here, Wilson is quoting a definition of Bipolar II Disorder provided by National Institute of Mental Health. *See* http://www.nimh.nih.gov/health/topics/bipolar-disorder/index.shtml

(Administrative Record at 25). The Court finds Wilson's second argument to be without merit.

Lastly, Wilson notes that "the ALJ made the argument that when [Wilson] took his medications as prescribed that his symptoms are reduced. The Record for the eighteen months prior to the decision do not support that argument."[12] Wilson provides no further discussion of this argument and points to nothing in the administrative record to support his position.[13] Contrary to Wilson's argument, the ALJ supported his conclusion that Wilson "responded very well to medical management of his bipolar symptoms" with substantial evidence in the record.[14]

Having dispensed with Wilson's arguments, the Court now provides its own analysis of the ALJ's credibility determination. It is clear from the ALJ's decision that he considered and discussed Wilson's daily activities, treatment history, use of medication, and functional restrictions in making his credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Wilson's subjective allegations of disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker*

---

[12] *Id.* at 27.

[13] Although Wilson's discussion of the ALJ's credibility determination does not discuss his contention that the ALJ failed to include pertinent evidence in the record, he later argues that the ALJ failed to fully and fairly develop the record by not including certain evidence. Because Wilson does not discuss this alleged unincluded evidence, it is unclear whether Wilson believes that any of the alleged unincluded evidence is pertinent to his argument regarding the ALJ's credibility determination. Regardless, the Court will address whether the record was fully and fairly developed later in this decision.

[14] *See* Administrative Record at 20-22. Here, the ALJ provides a thorough analysis of Wilson's mental health diagnoses of record.

v. *Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Wilson's subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## 2. *Dr. Samo's Opinions and the ALJ's Development of the Record*

Wilson argues that the ALJ erred in rejecting the opinions of Dr. Samo. Wilson's brief on this issue provides a plethora of case law, but very little argument or analysis. It appears that Wilson believes that the ALJ erred by discounting Dr. Samo's opinion that:

> . . . Wilson would not be able to consistently work eight hour days. It would result in working at a much lower capacity up to a third or quarter of the day.

(Administrative Record at 374.) Wilson, however, offers no argument or explanation for how the ALJ erred in discounting Dr. Samo's opinion.

Wilson also objects to the ALJ's conclusion that Dr. Samo's opinions were "not supported by a documented treatment history."[15] Wilson maintains that:

> Administrative Judge hearings in Iowa are conducted by the Iowa Communications Network. The exhibits in these cases are done electronically. As a result, it can never be clear to Claimant's Representative what evidence is actually before the ALJ. It is clear from the ALJ decision and the Record in this case that these eighteen months of Records of medical treatment by [Wilson] at the Black Hawk-Grundy Mental Health Center were not considered by the ALJ. This forms

---

[15] *See* Administrative Record at 23 ("[T]he undersigned finds that the statements of Dr. Samo[] not supported by a documented treatment history or consistent with the record when considered as a whole.").

> the basis for what would amount to grounds requiring a new
> trial if governed by Rule 59 of the <u>Federal Rules of Civil</u>
> <u>Procedure</u>. If the Court does not reverse this case for payment
> of benefits, [Wilson] would urge that this case be remanded to
> the ALJ for re-consideration of the case based on these
> records.

(*See* Wilson's Brief at 27-28.) Wilson continues this line of argument in his Reply Brief:

> All records which claimants provide to Social Security are sent
> via electronic transmission. Previously, at a hearing a paper
> file would be present that all of the parties would be able to
> review and determine whether information submitted by
> claimants counsel were part of the record of the case. Now,
> with the Administrative Law Judge and the claimant over 100
> miles away from each other, and the file is totally in an
> electronic format, it is impossible for claimants counsel to be
> able to determine whether all of the information that has been
> provided the Administrative Law Judge has been made part of
> the file. . . . We have argued that with Appendix A that it
> should be possible for the Court to be able to award benefits
> on the record. In the alternative, we would argue that this is
> new and material evidence and that its omission from the
> record should form a basis for remanding this case back to the
> Administration for further consideration.

(*See* Wilson's Reply Brief at 1-2.)

### a. *Did the ALJ Fully and Fairly Develop the Record?*

The Court will first consider Wilson's argument that the ALJ failed to fully and fairly develop the record by failing to include Dr. Samo's treatment records in the administrative record.[16] An ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record

---

[16] Wilson attached Dr. Samo's treatment records to his Brief as Appendix A (docket number 9-2).

fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

Reviewing courts also have the authority to order the consideration of additional evidence, but "'only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in the prior proceeding.'" *Woolf v Shalala*, 3 F.3d 1210, 1215 (8th Cir. 1993) (quoting 42 U.S.C. § 405(g)). New evidence is material if it is "non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the [Commissioner's] determination." *Id.* (citing *Szubak v. Secretary of Health and Human Services*, 745 F.2d 831, 833 (3d Cir. 1984)); *see also Hinchey v. Shalala*, 29 F.3d 428, 432-33 (8th Cir. 1994) (same). Furthermore, "[g]ood cause does not exist when the claimant had an opportunity to obtain the new evidence before the administrative record closed but failed to do so without providing sufficient explanation." *Hepp v. Astrue*, 511 F.3d 798, 808 (8th Cir. 2008) (citing *Hinchey*, 29 F.3d at 433). Moreover, "'An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" *Anderson*, 51 F.3d at 779 (quoting *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994)).

The record reveals that at the first administrative hearing, Wilson's attorney informed the ALJ that:

> . . . we're very short time in this case and that, as a result, we
> have not had the opportunity to get his medical records
> updated. We requested his mental health records from Black

> Hawk County, Black Hawk (inaudible) Mental Health from
> Dr. Samo (phonetic), along with an opinion from Dr. Samo
> with regard to his condition. Unfortunately, the soonest that
> Dr. Samo can see him is sometime in September, so we're
> going to ask that the record be kept open for 60 days to
> provide that information as well as that report.

(Administrative Record at 409.) The ALJ agreed to keep the record open to allow Wilson to provide treatment history and opinion evidence from Dr. Samo to the administrative record. At the supplemental hearing, the ALJ and Wilson's attorney had the following conversation:

| | |
|---|---|
| ALJ: | . . . I don't believe there are any other issues. Are there any objections to the Exhibits? |
| ATTY: | No, Judge, but I just want to remind you this is a supplemental hearing and we previously had [Wilson] testify in the case. |
| ALJ: | I'm aware of that. |
| ATTY: | I have no objection to any of the Exhibits. I assume that Dr. -- that the mental health interrogatories that we faxed to you 8/14 of '07 and the letter from, from Dr. Samo in May, dated August 16th, is part of the record. |
| ALJ: | They're in here as Exhibit 19F and 18F. And the one that -- |
| ATTY: | Then I have no objection. I have no objection then to the record as it is constituted. . . . |

(Administrative Record a 450.)

The Court finds that Wilson fails to show good cause why the evidence he attached at Appendix A was not incorporated into the record. Wilson's argument that "it can never be clear" to a claimant's attorney what evidence is before an ALJ because evidence is submitted electronically to the ALJ is without merit. Specifically, the hearing transcript shows that the ALJ kept the record open for 60 days to allow Wilson's attorney to include Dr. Samo's records and opinions regarding Wilson's mental health into the administrative

record.[17]   At the supplemental hearing, Wilson's attorney indicated that he *faxed* Dr. Samo's mental health interrogatories and letter to the ALJ for inclusion in the administrative record, not that he transmitted them electronically.[18]   Additionally, Wilson's attorney did not state that he attempted to fax any other documents for inclusion in the administrative record to the ALJ.  In fact, Wilson's attorney specifically stated that "I have no objection then to the record as it is constituted."[19]   In summary, there is no indication that Wilson's attorney attempted to transmit the information in Appendix A electronically or by fax to the ALJ.  Furthermore, the Court notes that there are no Exhibit markings on the records contained in Appendix A suggesting that they were intended to be included in the administrative record.  Therefore, the Court finds that good cause does not exist because Wilson had the opportunity to provide the new evidence to the ALJ before the record closed, but failed to do so without providing a sufficient explanation for this failure.  *See Hepp*, 511 F.3d at 808 ("Good cause does not exist when the claimant had an opportunity to obtain the new evidence before the administrative record closed but failed to do so without providing sufficient explanation.").  The Court also determines that the ALJ fully and fairly developed the record in this matter, and finds that there is sufficient evidence in the record to support the ALJ's decision.  *See Cox*, 495 F.3d at 618; *Anderson*, 51 F.3d at 779.

### b.   Did the ALJ Properly Consider Dr. Samo's Opinions?

The Court will now consider whether the ALJ properly considered Dr. Samo's opinions in making his disability determination.  An ALJ is required to "assess the record

---

[17] *See* Administrative Record at 409.

[18] *Id*. at 450 ("I assume that Dr. -- that the mental health interrogatories that we *faxed* to you 8/14 of '07 and the letter from, from Dr. Samo in May, dated August 16th, is part of the record.") (Emphasis added).

[19] *See* Administrative Record at 450.

as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). The regulations provide that the longer the treating relationship between a physician and a patient, the more weight should be given to that treating physician's medical opinions. *See* 20 C.F.R. § 404.1527(d)(2)(I). Furthermore, an ALJ is "encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." *Singh*, 222 F.3d at 452. The regulations require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id*. "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id*.; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id*."); *Strongson*, 361 F.3d at 1070 (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other

substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

In his decision, the ALJ notes that "[a]lthough Dr. Samo[] asserted that if [Wilson] worked an 8-hour day, it would result in a reduced pace for 1/4 to 1/3 of the day, [Wilson] retained fair to good mental abilities in all categories needed to perform unskilled work."[20] The ALJ further noted that Dr. Samo assigned Wilson a GAF score of 55 which indicates "no more than moderate limitation in occupational and social functioning."[21] The ALJ's decision also provides that:

> the undersigned has considered the mental consultative examinations as well as the treatment histories of mental health professionals which consistently extend a range of mild to moderate mental limitations impacting the ability to perform unskilled work-related functions. . . . In addition, the undersigned finds that the statements of Dr. Samo[] not supported by a documented treatment history or consistent with the record when considered as a whole.

(Administrative Record at 23; *see also* pages 20-22 of the ALJ's decision for his thorough discussion of Wilson's mental health treatment.)

Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Samo. The Court also finds that the ALJ provided "good reasons" for rejecting Dr. Samo's opinions. *See* 20 C.F.R. § 404.1527(d)(2); *Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

---

[20] *See* Administrative Record at 22.

[21] *Id.*

### 3.    *Hypothetical Question*

Wilson argues that the ALJ's hypothetical questions to the vocational expert did not adequately describe his limitations because the ALJ failed to include his subjective allegations of disability and the opinions of Dr. Samo in the questions. Hypothetical questions posed to a vocational expert, including a claimant's RFC, must set forth his or her physical and mental impairments. *Goff*, 421 F.3d at 794. "The hypothetical question must capture the concrete consequences of the claimant's deficiencies." *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001) (citing *Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997)). The ALJ is required to include only those impairments which are substantially supported by the record as a whole. *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001); *see also Haggard v. Apfel*, 201 F.3d 591, 595 (8th Cir. 1999) ("A hypothetical question 'is sufficient if it sets forth the impairments which are accepted as true by the ALJ.' *See Davis v. Shalala*, 31 F.3d 753, 755 (8th Cir. 1994) (quoting *Roberts v. Heckler*, 783 F.2d 110, 112 (8th Cir. 1985)."). In Sections *V.B.1* and *V.B.2.b* of this decision, the Court determined that the ALJ made a proper credibility determination for Wilson and properly discounted the opinions of Dr. Samo. Therefore, the Court finds that the ALJ did not err by not including Wilson's subjective allegations and Dr. Samo's opinions in the hypothetical questions. *See Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004) (an ALJ need only include those work-related limitations that he or she finds credible).

## VI.    CONCLUSION

The Court finds that the ALJ made a proper credibility finding with regard to Wilson's subjective allegations of disability, fully and fairly developed the record, properly rejected the opinions of Dr. Samo, and provided the vocational expert with appropriate hypothetical questions. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and should be affirmed.

## *VII. RECOMMENDATION*

For the reasons set forth above, I respectfully recommend that the district court **AFFIRM** the final decision of the Commissioner of Social Security and **DISMISS** with prejudice Plaintiff's Complaint (docket number 1) filed on May 28, 2008.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within ten (10) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court.

DATED this 28ᵗʰ day of April, 2009.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA